FILED

DEC - 1 2014

USDC WP SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PARMWOOD ASSIGNMENT LLC,

                Plaintiff,

v.

GINZA 3, LLC, GINZA HOLDING LLC,
DZENALI KVARATSKHELIYA a/k/a
DMITRY SERGEEV, TATIANA B. BRUNETTI,
and GINZA 2, LLC
d/b/a MARI VANNA RESTAURANT,

                Defendants.

---

Docket No.:

## 14 CIV. 9467

### JUDGE ENGELMAYER

---

## COMPLAINT

### I.    INTRODUCTION

Plaintiff Parmwood Assignment LLC, as assignee, brings this action to recover millions of dollars in monies loaned to Ginza 3, LLC ostensibly for the purpose of financing a New York City nightclub and restaurant. The restaurant and nightclub failed, Ginza 3, LLC defaulted, and the loans remain unpaid. Ginza 3, LLC breached the commercial loan agreements, and Plaintiff, as assignee of the original lenders, is entitled to recover now the full amount due and owing. Defendants also collectively engaged in a fraudulent scheme to avoid or hinder repayment of the debt owed, including by diverting loan funds to finance other unrelated business ventures. Plaintiff is entitled to an order voiding the fraudulent transfers, and entry of equitable orders barring Defendants from further dissipating assets of Ginza 3, LLC.

{V0211022.1}

## II.    PARTIES

1.      Plaintiff Parmwood Assignment LLC ("Parmwood") is a Delaware limited liability company with its principal place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware, County of New Castle.

2.      Plaintiff is the assignee of original lenders Conewood Limited ("Conewood") and Parmstone LTD ("Parmstone") (collectively the "Lenders").

3.      Defendant Ginza 3, LLC (the "Company") is a New York limited liability company with a place of business at 41 East 20th Street, N.Y., N.Y. 10003, County of New York.

4.      Defendant Ginza Holding, LLC ("Ginza Holding") is a New York limited liability company with a place of business at 247 West 46th Street, Apt 3502, N.Y., N.Y. 10036, County of New York.

5.      Defendant Tatiana B. Brunetti ("Brunetti") is an individual who, upon information and belief, resides at 68 Highland Avenue, Demarest, New Jersey, County of Bergen.

6.      Defendant Dzhenali Kvaratskheliya a/k/a Dmitry Sergeev ("Sergeev") is an individual who, upon information and belief, resides in Los Angeles, California, County of Los Angeles.

7.      Defendant Ginza 2, LLC d/b/a Mari Vanna Restaurant ("Mari Vanna") is a New York limited liability company with a place of business at Mari Vanna, 41 East 20th Street. N.Y., N.Y. 10003, County of New York.

## III.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship of the parties and the amount in controversy

exceeds the jurisdictional amount, exclusive of costs and fees.  Venue in this Court is proper pursuant to 28 U.S.C. § 112(b).

## IV.  FACTUAL ALLEGATIONS

9.    The Company was established and formed in 2008.

10.    Sergeev and Brunetti originally owned all membership interests in the Company.

11.    Sergeev and Brunetti subsequently transferred their membership interests in the Company.  However, Sergeev and Brunetti continued to manage and control the daily operations of the Company through 2014.

12.    Brunetti and Sergeev, individually or through other entities, owned or controlled Ginza Holding.

13.    At all relevant times, Brunetti and Sergeev, individually or through Ginza Holding, served on the Board of Directors a/k/a the Board of Managers for the Company.

14.    Sergeev and Brunetti each at various times through 2014 held the title of Executive Manager and/or Managing Member of the Company.

15.    At all relevant times, Sergeev and Brunetti maintained the financial books and records of the Company, and controlled the Company finances.

16.    At all times relevant, both Sergeev and Brunetti were fiduciaries of the Company.

17.    Sergeev and Brunetti caused the Company to borrow in excess of $6 million purportedly to construct, open, and operate a high-end nightclub lounge, bar, and restaurant/cabaret business known as Jelsomino located in the Dream Hotel in New York City (the "Restaurant").

18.    Sergeev and Brunetti were responsible for the day-to-day management and supervision of all aspects of operating the business of the Restaurant.

19.    Sergeev and Brunetti represented that the Company needed to borrow substantial monies to develop, construct, fund and operate the Restaurant.

20.    Commencing in 2010, the Company entered into various loan agreements with Conewood (the "Conewood Loan Agreements"), whereby Conewood loaned the Company a total principal amount of $3,424,000.00 (the "Conewood Loan").   Copies of the Conewood Loan Agreements are attached hereto collectively at **Exhibit 1** and incorporated herein.

21.    The Company agreed to repay the Conewood Loan with interest in accordance with the terms and conditions of the Conewood Loan Agreements.

22.    The Conewood Loan Agreements included a covenant by the Company, as Borrower, to maintain and preserve its existence and business as presently conducted.

23.    The Conewood Loan Agreements provided that that breach of any covenant by the Company would constitute an Event of Default, which permitted acceleration of the entire unpaid principal balances due and owing on the Conewood Loan without further notice to the Company and without any opportunity to cure.

24.    In 2014, the Company ceased operating the Restaurant, thereby triggering an Event of Default under the Conewood Loan Agreements.

25.    In 2011, Parmstone agreed to loan the Company the principal amount of $3,335,917.00 (the "Parmstone Loan") through a written agreement (the "Parmstone Loan Agreement").   A copy of the Third Amended and Restated Operating Agreement of the Company containing the Parmstone Loan provisions and constituting the Parmstone Loan Agreement is attached hereto at **Exhibit 2** and incorporated herein.

26.    The Company agreed to repay the Parmstone Loan, plus interest, using revenue generated by the Restaurant.

27.    In 2014, the Company ceased operating the Restaurant, thereby resulting in a default under the Parmstone Loan.

28.    The Company failed to repay the Conewood Loan.

29.    The Company failed to repay the Parmstone Loan.

30.    The Lenders unconditionally assigned all of their rights to and under the Parmstone Loan to Parmwood.

31.    The Lenders unconditionally assigned all of their rights to and under the Conewood Loan to Parmwood.

32.    At all times, Sergeev and Brunetti represented that the monies advanced under the Parmstone Loan and Conewood Loan were utilized solely for the benefit of the Company and the Restaurant.

33.    During this same time period, upon information and belief, Sergeev and Brunetti were working on or participating in a number of other business ventures.

34.    One of the other projects involved Mari Vanna, a high-end restaurant located in New York City.

35.    Upon information and belief, Brunetti, Sergeev, and/or Ginza Holding utilized monies of the Company received pursuant to the Parmstone Loan and the Conewood Loan to fund and finance the operations of Mari Vanna, contrary to the representations and promises that all loan monies were used for the benefit of the Company and the Restaurant.

36.    Upon information and belief, Mari Vanna received multiple cash transfers from the Company.  In excess of $350,000.00 transferred from the Company to or for the benefit of Mari Vanna in 2012, alone.

37.     Upon information and belief, Brunetti and Sergeev caused loan monies intended for the benefit of the Company to be diverted through the bank accounts of Attorney Alexander Karasik, who also worked on other entities for Brunetti, Sergeev, and Ginza Holding.

38.     Upon information and belief, the monies received by the Company pursuant to the Parmstone Loan and Conewood Loan and other assets of the Company were transferred and conveyed by one or more of the Defendants to Mari Vanna for less than fair consideration.

39.     Upon information and belief, the monies received by the Company pursuant to the Parmstone Loan and Conewood Loan and other assets of the Company were transferred and conveyed by one or more of the Defendants to Ginza 5, LLC for less than fair consideration.

40.     Upon information and belief, the monies received by the Company pursuant to the Parmstone Loan and Conewood Loan and other assets of the Company were transferred and conveyed by one or more of the Defendants to Ginza Holding or its portfolio companies for less than fair consideration.

41.     Upon information and belief, the monies received by the Company pursuant to the Parmstone Loan and Conewood Loan and other assets of the Company were transferred and conveyed by one or more of the Defendants to other entities operated or controlled by Sergeev or Brunetti for less than fair consideration.

42.     Upon information and belief, the Company was either insolvent at the time of the transfers and conveyances, or became insolvent as a result of the transfers and conveyances.

43.     Brunetti and Sergeev provided financial accountings and reconciliations of the loan monies that were incomplete, misleading, or inaccurate.

44.     Brunetti admitted that monies received by the Company pursuant to the Conewood Loan and Parmstone Loan were transferred to other entities.

45.    Brunetti admitted operating approximately twelve (12) different companies individually or through Ginza Holding, and conceded transfers of Company assets to the other businesses.

46.    Upon information and belief, Ginza Holding received the benefit of loan money earmarked for the Company as a result of the actions of Sergeev and Brunetti.

47.    Upon information and belief, Sergeev and Brunetti hold an ownership interest in or manage Ginza Holding.

48.    Upon information and belief, Ginza Holding owns and operates a portfolio of companies that operate in the hospitality and restaurant industry.

49.    Upon information and belief, Ginza Holding and/or its portfolio companies received the benefit of the loan monies intended for the Company pursuant to the Parmstone Loan and Conewood Loan.

50.    In April 2013, Brunetti and Sergeev falsely represented that revenues from the Restaurant were growing and that the Company would be profitable within weeks, with the intent to deceive and hide the diversion of Company assets.

51.    In May 2013, Brunetti and Sergeev falsely represented that attendance at the Restaurant was strong, that revenue was growing, and that the Restaurant would achieve profitability, again with the intent to deceive and hide the diversion of Company assets.

52.    Soon thereafter, Sergeev and Brunetti suddenly reported that the Restaurant was closing operations due to a lack of revenue and continued losses.

53.    By August 2013, the Restaurant ceased daily operations.

54.    The Company's lease was terminated in 2014.

55.     Sergeev and Brunetti ignored requests for information about Company assets, and provided vague, inconsistent and sporadic information about the Restaurant.

56.     Brunetti and Sergeev ignored demands for an accounting of the loan monies.

57.     Sergeev and Brunetti misrepresented the financial condition of the Company.

58.     Sergeev and Brunetti used the monies received from the Parmstone Loan and the Conewood Loan and other assets of the Company for their own personal benefit and benefit of other companies in which they had a personal financial interest or stake, including Mari Vanna.

59.     As a result of the diversion of Company assets, the Company was unable to continue to operate and unable to repay the Parmstone Loan and Conewood Loans.

### V.     CAUSES OF ACTION
### Count I
### (Breach of Contract)

60.     Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61.     The Company entered into the Conewood Loan Agreements as binding contracts supported by valuable consideration.

62.     The Company entered into the Parmstone Loan Agreement as a binding contract supported by valuable consideration.

63.     Conewood fully performed under the Conewood Loan Agreements.

64.     Parmstone fully performed under the Parmstone Loan Agreement.

65.     The Company breached the Conewood Loan Agreements by failing or refusing to utilize all of the monies received pursuant to the Conewood Loan for the purpose of constructing, opening, and operating the Restaurant, and in other ways that will be proven at trial.

66.     The Company breached the Parmstone Loan Agreement by failing or refusing to utilize all of the monies received pursuant to the Parmstone Loan for the purpose of constructing, opening, and operating the Restaurant, and in other ways that will be proven at trial.

67.     The Company breached the Conewood Loan Agreements by failing or refusing to repay the Conewood Loan.

68.     The Company breached the Parmstone Loan Agreement by failing or refusing to repay the Parmstone Loan.

69.     The Company defaulted under the Conewood Loan Agreements.

70.     The Company defaulted under the Parmstone Loan Agreement.

71.     Parmstone and Conewood have assigned all rights and claims to Parmwood.

## Count II
### (Unjust Enrichment)

72.     Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

73.     The Company, Brunetti, Sergeev, Mari Vanna, and Ginza Holding retained the benefit of the monies had and received pursuant to the Parmstone Loan and the Conewood Loan.

74.     The Company, Brunetti, Sergeev, Mari Vanna, and Ginza Holding were unjustly enriched.

75.     Equity and good conscience require restitution by the Company, Brunetti, Sergeev, Mari Vanna, and Ginza Holding of all amounts unjustly retained.

76.     Parmwood, as assignee, is entitled to be paid restitution as a result of the unjust enrichment of Defendants.

**Count III**
**(Breach of Fiduciary Duty)**

77.     Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

78.     At all relevant time, Brunetti and Sergeev were directors and Executive Managers of the Company with direct control over and responsibility for the daily operations of the Company.

79.     Brunetti and Sergeev owed a fiduciary duty to general creditors of the Company to preserve assets of the Company once the Company became insolvent.

80.     Sergeev and Brunetti breached their fiduciary duties owed to the Lenders as general creditors of the Company.

81.     As a direct and proximate result of the breach of fiduciary duty, the Lenders suffered and continue to suffer loss and damage, including economic injury.

82.     The Lenders have assigned all rights and claims to Parmwood.

**Count IV**
**(Fraudulent Conveyance/Transfer)**

83.     Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

84.     The Lenders, at all times relevant, were and are creditors of the Company.

85.     Sergeev and/or Brunetti caused the Company to convey and transfer assets, including monies received pursuant to the Parmstone Loan and Conewood Loan, to third-parties to benefit their own personal financial interests.

86.     Sergeev and/or Brunetti caused the Company to convey and transfer assets for less than fair consideration.

87.     Sergeev and/or Brunetti caused the Company to convey and transfer assets at the time that the Company was insolvent.

88.     Sergeev and/or Brunetti caused the Company to convey and transfer assets that resulted in the Company becoming insolvent.

89.     Sergeev and/or Brunetti caused the Company to incur obligations that hindered, delayed, or defrauded creditors.

90.     Sergeev and/or Brunetti caused the Company to convey and transfer assets that hindered, delayed, or defrauded creditors.

91.     The transfers, conveyances, and obligations incurred are void and must be set aside pursuant to New York Creditor & Debtor Law, and common law.

92.     The transfers, conveyances, and obligations incurred were made by Sergeev and/or Brunetti with the actual intent to defraud, hinder, or delay creditors.

93.     The transfers, conveyances, and obligations incurred are void and must be set aside pursuant to New York Creditor & Debtor Law § 276.

94.     Mari Vanna, Sergeev, Brunetti, and Ginza Holding received or retained the benefit of one or more of the fraudulent transfers and conveyances of Company assets, and are liable to disgorge all assets as fraudulent conveyances or transfers.

95.     Parmwood, as assignee, is a creditor and holds all rights and claims to set aside the fraudulent transfers or conveyances.

96.     Parmwood, as assignee, is a creditor and holds all rights and claims to recover the fraudulent transfers or conveyances.

## Count V
### (Constructive Trust)

97.    Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

98.    Sergeev and/or Brunetti utilized assets for the benefit of the operation of other business ventures and entities over which each had control or in which each held a personal interest, including Mari Vanna and Ginza Holding.

99.    Sergeev and Brunetti co-mingled the assets of the Company with the assets of other ventures or entities, including Mari Vanna and Ginza Holding.

100.    Brunetti and Sergeev caused to be transferred to Mari Vanna assets of the Company, including funds received from the Parmstone Loan and the Conewood Loan.

101.    Brunetti and Sergeev caused to be transferred to Ginza Holding or its portfolio companies assets of the Company, including funds received from the Parmstone Loan and the Conewood Loan.

102.    Parmwood is entitled to the imposition of a constructive trust over assets of the Company, including loan monies or other property derived therefrom, in the possession, custody, or control of Sergeev and/or Brunetti as well as other entities or ventures that Sergeev and /or Brunetti own, operate, or control including Mari Vanna and Ginza Holding.

103.    Parmwood is entitled to the imposition of a constructive trust to recover Company assets and/or avoid the further dissipation of Company assets.

## Count VI
### (Accounting)

104.    Plaintiff repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

105.   Sergeev and Brunetti must account for all Company assets utilized for the benefit of the operation of other personal business ventures and entities over which Brunetti and/or Sergeev had control or in which each held a personal interest, including all loan monies received pursuant to the Conewood Loan and Parmstone Loan.

## VI.   **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Parmwood Assignment LLC respectfully requests this Honorable Court to:

1. Enter judgment in its favor on all Counts of the Complaint;

2. Award damages of not less $6,759,917.00 on all Counts of the Complaint together with interest thereon;

3. Order Brunetti and Sergeev to provide a full and complete accounting of all assets of Ginza 3, LLC, including all loan monies received pursuant to the Parmstone Loan Agreement and the Conewood Loan Agreements;

4. Declare void the fraudulent transfers and conveyances to or by the Defendants;

5. Order that Sergeev, Brunetti, Ginza Holding, LLC, and Mari Vanna to pay over all assets of Ginza 3, LLC that were fraudulently transferred or conveyed;

6. Order a constructive trust shall be imposed on all assets of Ginza 3, LLC in the possession, custody or control of Sergeev and/or Brunetti or caused to be transferred or conveyed by Sergeev and/or Brunetti to third-parties, including Mari Vanna and Ginza Holding, LLC;

7. Enter an injunction restraining and enjoining Sergeev and/or Brunetti from dissipating, conveying, transferring, or disposing of any assets of Ginza 3, LLC in the possession, custody or control of Brunetti and/or Sergeev or in the possession, custody or control of any entity or third-party which Sergeev and/or Brunetti own, operate, manage, or control, including Mari Vanna and Ginza Holding, LLC.

8. Awarding attorneys' fees, costs and disbursements incurred in bringing this action; and,

9.     Granting such other and further relief as to this Court deems just and proper.

Dated:   White Plains, New York
         November 3, 2014

                            **ECKERT SEAMANS CHERIN & MELLOTT,
                            LLC**

                            *Attorneys for Plaintiff*
                            *Parmwood Assignment LLC*

                            By: _____
                                    Thomas M. Smith. (TMS-9962)
                            10 Bank Street, Suite 700
                            White Plains, NY 10606
                            914-286-2807
                            *tsmith@eckertseamans.com*

# EXHIBIT 1

# LOAN AGREEMENT

THIS LOAN AGREEMENT № 2, dated as of 01.06. 2010 is made by and among GINZA 3, LLC is a Limited Liability Company incorporated under the laws of the State of New York, USA whose registered address is 204 West 55ᵗʰ Street, New York, New York, USA (the "Borrower"), and CONEWOOD LIMITED, a company with registered number HE 192397 whose registered office is at Julia House, 3 Themistocles Dervis Street, CY-1591 Nicosia, Cyprus (the "Lender"). Certain other capitalized terms used herein, unless otherwise defined, are defined in Article 1.

## RECITALS:

WHEREAS, the Borrower needs funds for opening of the restaurant, lounge and bar under the brand name "JELSOMINO" to be established at 204 West 55ᵗʰ Street, New York, New York, USA (the "Project") for which the financing is needed; and

WHEREAS, the Borrower desires to obtain from the Lender a term loan in the maximum principal amount of 100 000.00 (Hundred thousand) United States Dollars, the proceeds of which will be used to finance the Project; and

WHEREAS, the Lender is willing to make the loan to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the terms and conditions herein contained, the Borrower and the Lender hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Definitions. As used herein, unless otherwise defined herein, the following terms shall have the following respective meanings:

"Agreement" means this Loan Agreement, as it may be amended, modified, supplemented, renewed or replaced from time to time.

"Borrower" has the meaning assigned thereto in the introduction to this Agreement.

"Business Day" means any day other than a Saturday or Sunday or another day on which commercial banks located in New York are authorized to close.

"Dollars" or "$" means dollars in lawful currency of the United States of America.

"Event of Default" shall mean any one or more of the events described in Section 6.1.

"Interest Rate" has the meaning assigned in Section 2.4 of this Agreement.

"Lender" has the meaning assigned thereto in the introduction to this Agreement.

"Loan" means the principal amount advanced by the Lender to the Borrower under Article 2.

"Maturity Date" means 04ᵗʰ of October, 2021;

1.2    Other Definitional Provisions. Any of the terms defined in Section 1.1 may be used in singular or plural form. As used herein, the singular includes the plural and the masculine gender includes the feminine and neuter genders, and vice versa. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

1

## ARTICLE 2

### AMOUNT AND TERMS OF THE TERM LOAN

2.1    Loan. In reliance on the representations and warranties herein and subject to and upon the terms and conditions herein, the Lender agrees to make the loan in the maximum principal amount of 100,000.00 (Hundred thousand) United States Dollars (the "Loan"), in the manner described in Section 2.3 below. The Loan shall be due and payable on the Maturity Date.

2.2    The Loan made by the Lender under this Article 2 shall be evidenced by this Agreement.

2.3    Notice and Manner of Making Loan. The Loan shall be disbursed to the Borrower by means of one of several tranches to the Borrower's account. The amount of each tranche should be determined by the Borrower but should not exceed the maximum principal amount determined by the Section 2.1 above. The Borrower should inform the Lender in writing on the requested amount and the requested date of provision of each tranche not less than 15 (fifteen) days in advance. The last tranche could be provided by the Lender to the Borrower not later than end of June, 2012. If, by this date the amount of tranches actually transferred to the Borrower is less than the amount of the Loan agreed by the Parties in Section 2.1 above, then the Borrower could not ask for any additional tranches to be provided by the Lender and the amount of the Loan should be calculated as the sum of amounts of all the tranches received by the Borrower.

2.4    Interest Rate. The Loan shall bear a fixed annual interest rate of Three (3.0%) Percent over the one year LIBOR rate at the time of execution of this agreement for initial three (3) years and Three and a Half (3.5%) over one year Libor rate for the remaining term.

2.5    Place and Manner of Payment. The Borrower shall repay principal and interest on the Loan and any other fees due not later than 11.00 A.M. (New York time) on the Maturity Date, in US Dollars immediately available to Lender.

2.6    Prepayments. The Borrower shall have the right to prepay without penalty all or any portion of the Loan. Any notice of prepayment given by either of the Borrower shall specify the amount to be prepaid and prepayment date. The Borrower may not re-borrow any amount of principal paid on the Loan.

## ARTICLE 3

### CONDITIONS PRECEDENT TO LENDING

3.1    The Loan. In addition to any other conditions set forth in this Agreement, the obligation of the Lender to provide the Loan is subject to the condition that the Operating Agreement of Ginza 3 LLC is signed between the Lender and other Members of the Borrower.  Parties acknowledge that this condition has been satisfied.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower hereby make the following representations and warranties, which shall be deemed to be continuing representations and warranties until payment in full of the Loan: -

4.1    Existence and Rights. The Borrower is duly organized and validly existing under the laws of the jurisdiction of its incorporation. The Borrower has full power and authority to own its respective property and to carry on its business as now conducted, and is duly qualified and

2

in good standing. The Borrower has full power and authority to execute, deliver and perform this Agreement to which such the Borrower is a party.

4.2.   **Authorized.** The Borrower's execution, delivery and performance of this Agreement, delivered and performed by such the Borrower has been duly authorized by all necessary corporate action, does not require any further consent or approval of any person, entity or governmental authority and is not in contravention of or in conflict with any law or regulation, or any term or provision of such the Borrower's certificate of incorporation, bylaws or other such corporate governance documents. This Agreement is delivered and performed by the Borrower, enforceable in accordance with their respective terms, subject to applicable insolvency, reorganization, liquidation, moratorium, readjustment of debt or other similar laws affecting the enforcement of creditors' rights and applicable principles of equity.

4.3.   **No Conflict.** The execution, delivery and performance of this Agreement is not in contravention of or in conflict with any law, statute, regulation, order, writ, injunction, decree, demand or material agreement, indenture or undertaking to which the Borrower is a party.

### ARTICLE 5

### COVENANTS

The Borrower hereby makes the following covenants, which shall be deemed to be continuing covenants until payment in full of the Loan, without prior written consent of Lender, pursuant to the:

5.1.   **Maintenance of Existence; Conduct of Business.** The Borrower shall preserve and maintain its existence, its business as presently conducted, and all of its rights, privileges and franchises necessary in the normal conduct of its business, and conduct its business in an orderly, efficient and regular manner, and shall comply in all material respects with all applicable laws and regulations of any governmental authority and the terms of any indenture, contract or other instrument to which it may be a party, if non-compliance would have a material adverse effect upon the business, properties or financial or other condition of the Borrower.

5.2.   **Compliance with Laws, Etc.** The Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority, non-compliance with which would materially adversely affect its business, properties, assets, operations and condition (financial or otherwise).

5.3.   **Notice of an adverse event.** The Borrower shall promptly give notice to Lender of (i) any litigation, suit, claim, investigation or other proceeding brought or asserted against it or any of its assets or properties involving money or property valued in excess of the value of the Loan promptly after learning thereof, and a monthly status report with respect thereto; (ii) the occurrence of any Event of Default or any event which with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

### ARTICLE 6

### EVENTS OF DEFAULT AND REMEDIES

6.1.   **Events of Default.** The occurrence of one or more of the following described events shall constitute an Event of Default under this Agreement:

(a)   The Borrower shall fail to make any payment of principal or interest or other sum owing under the terms of this Agreement, within fifteen (15) days of the date when the same becomes due and payable; or

3

(b)    The Borrower shall be in material breach of (i) any representation, warranty or certification contained in this Agreement or (ii) any covenant contained in this Agreement, which covenant remains uncured by the Borrower for thirty (30) days following the date thereof; or

(c)    The Borrower (i) is adjudicated by a court of competent jurisdiction to be insolvent (ii) files a voluntary petition or commence a voluntary case seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, (iii) consents to the institution of, or fail to controvert in a timely and appropriate manner, any petition or case of the type described above, (iv) applies for or consent to the appointment of or taking possession by a custodian, trustee, receiver or similar official for or of itself or all or a substantial part of its properties or assets, (v) fails generally, or admit in writing its inability to pay its debts generally as they become due, (vi) makes a general assignment for the benefit of creditors or (vii) takes any corporate action to authorize or approve any of the foregoing; or

(d)    Any involuntary petition or case shall be filed or commenced against the Borrower seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts, the appointment of a custodian, trustee, receiver or similar official for it or all or a substantial part of its properties or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, and such petition or case shall continue undismissed and unstayed for a period of sixty (60) days; or an order, judgment or decree approving or ordering any of the foregoing shall be entered in any such proceeding; or

(e)    Any provision thereof is declared or held to be invalid or unenforceable by a court of competent jurisdiction or is repudiated by the Borrower or alleged by the Borrower to be invalid or unenforceable.

6.2.    Remedies. Upon the occurrence and during the occurrence of an Event of Default, Lender, in addition to all rights and remedies provided by law at its option, and without notice to the Borrower may declare the entire unpaid principal amount under the Loan, and all interest accrued and unpaid thereon, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower.

6.3.    Waivers. The Borrower waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, notice of nonpayment at maturity, notice of intention to accelerate and notice of acceleration, so that the Lender may exercise any and all rights and remedies under the Loan Agreement, or as otherwise provided at law or in equity, immediately upon the occurrence of any Event of Default, without any further notice, grace or opportunity to cure whatsoever. Therefore, no further or delay of the Lender to exercise any right, power or privilege hereunder shall operate as a waiver.

6.3.    No Waiver of Remedies. No waiver of any breach of or default under any provision of the Loan Agreement shall constitute or be construed as a waiver by tender of any subsequent breach of or default under that or any other provision of the Agreement.

6.4.    Remedies Not Exclusive. No remedy herein upon Lender is intended to be exclusive of any other remedy herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

ARTICLE 7

4

## MISCELLANEOUS

7.1.    Notices. Except as otherwise provided in this Agreement, all notices, demands, instructions and other communications required or permitted to be given to or made upon either party hereto or any other person shall be in writing and shall be personally delivered or sent by nationally recognized overnight courier service, or by fax, and shall be deemed to be delivered to the intended recipient for purposes of this Agreement on the date that such writing is received after having been sent in accordance with the provisions of this Section 7.1. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective fax numbers) indicated in the introduction of this Agreement.

7.2.    Survival of Warranties. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement until the Loan is paid in full.

7.3.    Severability. In case any provision herein shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of the provisions and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7.4.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that the Borrower may not assign this Agreement or any of its rights under this Agreement or any other Loan Document without the prior written consent of the Lender.

7.5.    Headings. Headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.

7.6.    Modifications. This Agreement cannot be changed, modified or supplemented except in a writing signed by the party against whom enforcement of such change, modification or supplement is sought.

7.7    Payment on Non-Business Days. Whenever any payment to be made hereunder shall be due on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.

7.8.    Applicable Law This Agreement, its interpretation and enforceability and the rights and obligations of the Parties hereunder, as well as any non-contractual disputes in connection herewith, shall be governed by and construed in accordance with the laws of the State of New York, USA.

7.9.    Arbitration clause. In respect of any dispute or difference, controversy or claim of whatever nature howsoever arising under, out of or in connection with this Agreement, including regarding the breach, existence or validity of this Agreement or any non-contractual disputes in connection herewith (each a "Dispute"), the Parties shall endeavour in good faith to resolve such Dispute promptly and amicably through negotiations and:

(a)     if the matter is not resolved through such negotiations within thirty (30) days of any Party receiving written notification of the Dispute, then any Party may elect, by notice in writing to the other Parties, to settle and finally resolve such Dispute by arbitration in accordance with the International Chamber of Commerce ("ICC") in New York venue, Rules which Rules are deemed to be incorporated by reference into this clause;

(b)     the number of arbitrators should be 3 (three);

(c)     the seat or legal place of arbitration shall be deemed to be New York, and accordingly the substantive laws of New York shall be applicable for purposes of the arbitration. The venue for the arbitration hearing shall be London, at a location to be determined

5

by the tribunal.   The procedural law for any reference to arbitration shall be English
law.   The language of the arbitration proceedings shall be English;

(d)    the arbitrators shall be appointed by the ICC Court.

(e)    any right of appeal or reference of points of law to the New York courts is hereby
waived, to the extent that such waiver can be validly made.

7.10    Counterparts. This Agreement shall be executed in two counterparts, each of which shall
be deemed an original, but all of which together shall constitute one and the same instrument.

7.11    Integration. This Agreement, including all Exhibits hereto, supersedes any and all other
agreements, whether oral or written, which heretofore may have been made by and between
Lender and Borrower relating to the subject matter hereof.

7.12    Expenses. The Borrower further agree to pay reasonable attorneys' fees, court costs and
any other expenses, losses, charges, damages incurred or advances made by the Lender in the
enforcement and protection of its rights or caused by any Borrower's default under the terms of
this Agreement.

7.13    Taxes. The amount of the loan hereunder shall be free and clear of, and without
deduction for, any and all present and future taxes, levies and imposts or other charges of any
kind whatsoever, imposed, levied, collected or assessed with respect thereto by the Government
of the United Stated of America and/or any State thereof except for any withholding tax
imposed upon Lender which Borrower is required to deduct under the applicable laws,
Borrower shall furnish to Lender official tax receipts or other evidences issued by the tax
authorities of the United States of America sufficient to enable Lender to establish payment of
such withholding tax in support of a claim for an income tax credit.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first
set forth above.

The Borrower,                                     The Lender,

GINZA5 LLC                                       CONEWOOD LIMITED

By: _____                              By: _____

Name: Tatiana _____                            Name: Soterou's Kaspofrides

Title: Managing member                           Title: Director

In the presence of:


Witness to the signature of the Borrower:

Name of the witness: Julia _____

Address of the witness: Shore Line Highway, #D44
Brooklyn, NY 11235
USA

Witness to the signature of the Lender:

Name of the witness: Kyriakoula Nathanael

Address of the witness: Elenion Building, 2nd floor
6 Themistocles Dervis Street
CY-1066, Nicosia, Cyprus

6

# LOAN AGREEMENT

THIS LOAN AGREEMENT No. 1, dated as of 18.05.2010 is made by and among GINZA 3, LLC is a Limited Liability Company incorporated under the laws of the State of New York, USA whose registered address is 204 West 55th Street, New York, New York, USA (the "Borrower"), and CONEWOOD LIMITED, a company with registered number HE 192397 whose registered office is at Julia House, 3 Themistocles Dervis Street, CY-1591 Nicosia, Cyprus (the "Lender"). Certain other capitalized terms used herein, unless otherwise defined, are defined in Article I.

RECITALS:

WHEREAS, the Borrower needs funds for opening of the restaurant, lounge and bar under the brand name "JELSOMINO" to be established at 204 West 55th Street, New York, New York, USA (the "Project") for which the financing is needed; and

WHEREAS, the Borrower desires to obtain from the Lender a term loan in the maximum principal amount of $24 000.00 (Eight hundred twenty four thousand) United States Dollars, the proceeds of which will be used to finance the Project; and

WHEREAS, the Lender is willing to make the loan to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the terms and conditions herein contained, the Borrower and the Lender hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Definitions. As used herein, unless otherwise defined herein, the following terms shall have the following respective meanings:

"Agreement" means this Loan Agreement, as it may be amended, modified, supplemented, renewed or replaced from time to time.

"Borrower" has the meaning assigned thereto in the introduction to this Agreement.

"Business Day" means any day other than a Saturday or Sunday or another day on which commercial banks located in New York are authorized to close.

"Dollars" or "$" means dollars in lawful currency of the United States of America.

"Event of Default" shall mean any one or more of the events described in Section 6.1.

"Interest Rate" has the meaning assigned in Section 2.4 of this Agreement.

"Lender" has the meaning assigned thereto in the introduction to this Agreement.

"Loan" means the principal amount advanced by the Lender to the Borrower under Article 2.

"Maturity Date" means 04th of October, 2021.

1.2    Other Definitional Provisions. Any of the terms defined in Section 1.1 may be used in singular or plural form. As used herein, the singular includes the plural and the masculine gender includes the feminine and neuter genders, and vice versa. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

1

## ARTICLE 2

### AMOUNT AND TERMS OF THE TERM LOAN

2.1 Loan. In reliance on the representations and warranties herein and subject to and upon the terms and conditions herein, the Lender agrees to make the loan in the maximum principal amount of 824,000.00 (Eight hundred twenty four thousand) United States Dollars (the "Loan"), in the manner described in Section 2.3 below. The Loan shall be due and payable on the Maturity Date.

2.2 The Loan made by the Lender under this Article 2 shall be evidenced by this Agreement.

2.3 Notice and Manner of Making Loan. The Loan shall be disbursed to the Borrower by means of one of several tranches to the Borrower's account. The amount of each tranche should be determined by the Borrower but should not exceed the maximum principal amount determined by the Section 2.1 above. The Borrower should inform the Lender in writing on the requested amount and the requested date of provision of each tranche not less than 15 (fifteen) days in advance. The last tranche could be provided by the Lender to the Borrower not later than end of June, 2012. If by this date the amount of tranches actually transferred to the Borrower is less than the amount of the Loan agreed by the Parties in Section 2.1 above, then the Borrower could not ask for any additional tranches to be provided by the Lender and the amount of the Loan should be calculated as the sum of amounts of all the tranches received by the Borrower.

2.4 Interest Rate. The Loan shall bear a fixed annual interest rate of Three (3.0%) Percent over the one year LIBOR rate at the time of execution of this agreement for initial Three (3) years and Three and a Half (3.5%) over one year Libor rate for the remaining term.

2.5 Place and Manner of Payment. The Borrower shall repay principal and interest on the Loan, and any other fees due not later than 11.00 A.M. (New York time) on the Maturity Date, in US Dollars immediately available to Lender.

2.6 Prepayments. The Borrower shall have the right to prepay without penalty all or any portion of the Loan. Any notice of prepayment given by either of the Parties shall specify the amount to be prepaid and prepayment date. The Borrower may not re-borrow any amount of principal paid on the Loan.

## ARTICLE 3

### CONDITIONS PRECEDENT TO LENDING

3.1 The Loan. In addition to any other conditions set forth in this Agreement, the obligation of the Lender to provide the Loan is subject to the condition that the Operating Agreement of Ginza 3 LLC is signed between the Lender and other Members of the Borrower. Parties acknowledge that this condition has been satisfied.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower hereby make the following representations and warranties, which shall be deemed to be continuing representations and warranties until payment in full of the Loan:.

4.1 Existence and Rights. The Borrower is duly organized and validly existing under the laws of the jurisdiction of its incorporation. The Borrower has full power and authority to own

2

its respective property and to carry on its business as now conducted, and is duly qualified and in good standing. The Borrower has full power and authority to execute, deliver and perform this Agreement to which such the Borrower is a party.

4.2.    Authorized. The Borrower's execution, delivery and performance of this Agreement, delivered and performed by such the Borrower has been duly authorized by all necessary corporate action does not require any further consent or approval of any person, entity or governmental authority and is not in contravention of or in conflict with any law or regulation, or any term or provision of such the Borrower's certificate of incorporation, bylaws or other such corporate governance documents. This Agreement is delivered and performed by the Borrower, enforceable in accordance with their respective terms, subject to applicable insolvency, reorganization, liquidation, moratorium, readjustment of debt or other similar laws affecting the enforcement of creditors' rights and applicable principles of equity.

4.3.    No Conflict. The execution, delivery and performance of this Agreement is not in contravention of or in conflict with any law, statute, regulation, order, writ, injunction, decree, demand or material agreement, indenture or undertaking to which the Borrower is a party.

## ARTICLE 5

## COVENANTS

The Borrower hereby makes the following covenants, which shall be deemed to be continuing covenants until payment in full of the Loan, without prior written consent of Lender, pursuant to the:

5.1.    Maintenance of Existence; Conduct of Business. The Borrower shall preserve and maintain its existence, its business as presently conducted, and all of its rights, privileges and franchises necessary in the normal conduct of its business, and conduct its business in an orderly, efficient and regular manner, and shall comply in all material respects with all applicable laws and regulations of any governmental authority and the terms of any indenture, contract or other instrument to which it may be a party, if non-compliance would have a material adverse effect upon the business, properties or financial or other condition of the Borrower.

5.2.    Compliance with Laws; Etc. The Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority, non-compliance with which would materially adversely affect its business, properties, assets, operations and condition (financial or otherwise).

5.3.    Notice of an adverse event. The Borrower shall promptly give notice to Lender of (i) any litigation, suit, claim, investigation or other proceeding brought or asserted against it or any of its assets or properties involving money or property valued in excess of the value of the Loan promptly after learning thereof, and a monthly status report with respect thereto, (ii) the occurrence of any Event of Default or any event which with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

## ARTICLE 6

## EVENTS OF DEFAULT AND REMEDIES

6.1.    Events of Default. The occurrence of one or more of the following described events shall constitute an Event of Default under this Agreement:

(a)    The Borrower shall fail to make any payment of principal or interest or other sum owing under the terms of this Agreement, within fifteen (15) days of the date when the same becomes due and payable; or

(b)    The Borrower shall be in material breach of (i) any representation, warranty or certification contained in this Agreement or (ii) any covenant contained in this Agreement, which covenant remains uncured by the Borrower for thirty (30) days following the date thereof; or

(c)    The Borrower (i) is adjudicated by a court of competent jurisdiction to be insolvent (ii) files a voluntary petition or commence a voluntary case seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, (iii) consents to the institution of, or fail to controvert in a timely and appropriate manner, any petition or case of the type described above; (iv) applies for or consent to the appointment of or taking possession by a custodian, trustee, receiver or similar official for or of itself or all or a substantial part of its properties or assets; (v) fails generally, or admit in writing its inability to pay its debts generally as they become due, (vi) makes a general assignment for the benefit of creditors or (vii) takes any corporate action to authorize or approve any of the foregoing; or

(d)    Any involuntary petition or case shall be filed or commenced against the Borrower seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts, the appointment of a custodian, trustee, receiver or similar official for it or all or a substantial part of its properties or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, and such petition or case shall continue undismissed and unstayed for a period of sixty (60) days; or an order, judgment or decree approving or ordering any of the foregoing shall be entered in any such proceeding; or

(e)    Any provision thereof is declared or held to be invalid or unenforceable by a court of competent jurisdiction or is repudiated by the Borrower or alleged by the Borrower to be invalid or unenforceable.

6.2    Remedies. Upon the occurrence and during the occurrence of an Event of Default, Lender, in addition to all rights and remedies provided by law at its option, and without notice to the Borrower, may declare the entire unpaid principal amount under the Loan, and all interest accrued and unpaid thereon, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower.

6.3    Waivers. The Borrower waive, demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, notice of nonpayment at maturity, notice of intention to accelerate and notice of acceleration, so that the Lender may exercise any and all rights and remedies under the Loan Agreement, or as otherwise provided at law or in equity, immediately upon the occurrence of any Event of Default, without any further notice, grace or opportunity to cure whatsoever. Therefore, no further or delay of the Lender to exercise any right, power or privilege hereunder shall operate as a waiver.

6.3    No Waiver of Remedies. No waiver of any breach of or default under any provision of the Loan Agreement shall constitute or be construed as a waiver by lender of any subsequent breach of or default under that or any other provision of the Agreement.

6.4    Remedies Not Exclusive. No remedy herein upon Lender is intended to be exclusive of any other remedy herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

4

## ARTICLE 7

## MISCELLANEOUS

7.1     Notices. Except as otherwise provided in this Agreement, all notices, demands, instructions and other communications required or permitted to be given to or made upon either party hereto or any other person shall be in writing and shall be personally delivered or sent by nationally recognized overnight courier service, or by fax, and shall be deemed to be delivered to the intended recipient for purposes of this Agreement on the date that such writing is received after having been sent in accordance with the provisions of this Section 7.1. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective fax numbers) indicated in the introduction of this Agreement.

7.2     Survival of Warranties. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement until the Loan is paid in full.

7.3     Severability. In case any provision herein shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of the provisions and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7.4     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that the Borrower may not assign this Agreement or any of its rights under this Agreement or any other Loan Document, without the prior written consent of the Lender.

7.5     Headings. Headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.

7.6     Modifications. This Agreement cannot be changed, modified or supplemented except in a writing signed by the party against whom enforcement of such change, modification or supplement is sought.

7.7     Payment on Non-Business Days. Whenever any payment to be made hereunder shall be due on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.

7.8     Applicable Law This Agreement, its interpretation and enforceability and the rights and obligations of the Parties hereunder, as well as any non-contractual disputes in connection herewith, shall be governed by and construed in accordance with the laws of the State of New York, USA.

7.9     Arbitration clause. In respect of any dispute or difference, controversy or claim of whatever nature howsoever arising under, out of or in connection with this Agreement, including regarding the breach, existence or validity of this Agreement or any non-contractual disputes in connection herewith (each a "**Dispute**"), the Parties shall endeavour in good faith to resolve such Dispute promptly and amicably through negotiations and:

(a)     if the matter is not resolved through such negotiations within thirty (30) days of any Party receiving written notification of the Dispute, then any Party may elect, by notice in writing to the other Parties, to settle and finally resolve such Dispute by arbitration in accordance with the International Chamber of Commerce ("**ICC**") in New York venue, Rules which Rules are deemed to be incorporated by reference into this clause;

(b)     the number of arbitrators should be 3 (three);

5

(c)     the seat or legal place of arbitration shall be deemed to be New York, and accordingly the substantive laws of New York shall be applicable for purposes of the arbitration. The venue for the arbitration hearing shall be London, at a location to be determined by the tribunal. The procedural law for any reference to arbitration shall be English law. The language of the arbitration proceedings shall be English;

(d)     the arbitrators shall be appointed by the ICC Court;

(e)     any right of appeal or reference of points of law to the New York courts is hereby waived, to the extent that such waiver can be validly made.

7.10    Counterparts. This Agreement shall be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.11    Integration. This Agreement, including all Exhibits hereto, supersedes any and all other agreements, whether oral or written, which heretofore may have been made by and between Lender and Borrower relating to the subject matter hereof.

7.12    Expenses. The Borrower further agree to pay reasonable attorneys' fees, court costs and any other expenses, losses, charges, damages incurred or advances made by the Lender in the enforcement and protection of its rights or caused by any Borrower's default under the terms of this Agreement.

7.13    Taxes. The amount of the loan hereunder shall be free and clear of, and without deduction for, any and all present and future taxes, levies and imposts or other charges of any kind whatsoever, imposed, levied, collected or assessed with respect thereto by the Government of the United States of America and/or any State thereof except for any withholding tax imposed upon Lender which Borrower is required to deduct under the applicable laws. Borrower shall furnish to Lender official tax receipts or other evidences issued by the tax authorities of the United States of America sufficient to enable Lender to establish payment of such withholding tax in support of a claim for an income tax credit.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

The Borrower:                                              The Lender:

GINZA, LLC                                                CONEWOOD LIMITED

By: _____                                     By: _____

Name: Tatiana Nunech                                      Name: Soterakis Loupefides

Title: Managing Memb                                      Title: Director

In the presence of:

Witness to the signature of the Borrower: _____

Name of the witness: Julia Poddiak

Address of the witness: 1746 Kings Highway, Apt#4
                        Brooklyn, New York
                        USA

Witness to the signature of the Lender: _____

Name of the witness: Yiearoula Nathanael

Address of the witness: Elenion Building, 2nd floor
                        Themistokles Dervi Street
                        CY-1066, Nicosia, Cyprus

# LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of 04.10.2011 is made by and among GINZA 3, LLC is a Limited Liability Company incorporated under the laws of the State of New York, USA whose registered address is 204 West 55th Street, New York, New York, USA (the "Borrower") and CONEWOOD LIMITED, a company with registered number HE 192397 whose registered office is at Julia House, 3 Themistocles Dervis Street, CY-1591 Nicosia, Cyprus (the "Lender"). Certain other capitalized terms used herein, unless otherwise defined, are defined in Article 1.

## RECITALS:

WHEREAS, the Borrower needs funds for opening of the restaurant, lounge and bar under the brand name "JELSOMINO" to be established at 204 West 55th Street, New York, New York, USA (the "Project") for which the financing is needed; and

WHEREAS, the Borrower desires to obtain from the Lender a term loan in the maximum principal amount of 2,000,000.00 (Two million) United States Dollars, the proceeds of which will be used to finance the Project; and

WHEREAS, the Lender is willing to make the loan to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the terms and conditions herein contained, the Borrower and the Lender hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1    Certain Definitions. As used herein, unless otherwise defined herein, the following terms shall have the following respective meanings:

"Agreement" means this Loan Agreement, as it may be amended, modified, supplemented, renewed or replaced from time to time.

"Borrower" has the meaning assigned thereto in the introduction to this Agreement.

"Business Day" means any day other than a Saturday or Sunday or another day on which commercial banks located in New York are authorized to close.

"Dollars" or "$" means dollars in lawful currency of the United States of America.

"Event of Default" shall mean any one or more of the events described in Section 6.1.

"Interest Rate" has the meaning assigned in Section 2.4 of this Agreement.

"Lender" has the meaning assigned thereto in the introduction to this Agreement.

"Loan" means the principal amount advanced by the Lender to the Borrower under Article 2.

"Maturity Date" means 04th of October, 2021.

1.2    Other Definitional Provisions. Any of the terms defined in Section 1.1 may be used in singular or plural form. As used herein, the singular includes the plural and the masculine gender includes the feminine and neuter genders, and vice versa. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

1

## ARTICLE 2

### AMOUNT AND TERMS OF THE TERM LOAN

2.1.    Loan. In reliance on the representations and warranties herein and subject to and upon the terms and conditions herein, the Lender agrees to make the loan in the maximum principal amount of 2,000,000.00 (Two million) United States Dollars (the "Loan"), in the manner described in Section 2.3 below. The Loan shall be due and payable on the Maturity Date.

2.2    The Loan made by the Lender under this Article 2 shall be evidenced by this Agreement.

2.3    Notice and Manner of Making Loan. The Loan shall be disbursed to the Borrower by means of one of several tranches to the Borrower's account. The amount of each tranche should be determined by the Borrower, but should not exceed the maximum principal amount determined by the Section 2.1 above. The Borrower should inform the Lender in writing on the requested amount and the requested date of provision of each tranche not less than 15 (fifteen) days in advance. The last tranche could be provided by the Lender to the Borrower not later than end of June, 2012. If by this date the amount of tranches actually transferred to the Borrower is less than the amount of the Loan agreed by the Parties in Section 2.1 above, then the Borrower could not ask for any additional tranches to be provided by the Lender and the amount of the Loan should be calculated as the sum of amounts of all the tranches received by the Borrower.

2.4.    Interest Rate. The Loan shall bear a fixed annual interest rate of Three (3.0%) Percent over the one year LIBOR rate at the time of execution of this agreement for initial three (3) years and Three and a Half (3.5%) over one year Libor rate for the remaining term.

2.5    Place and Manner of Payment. The Borrower shall repay principal and interest on the Loan, and any other fees due not later than 11.00 AM. (New York time) on the Maturity Date, in US Dollars immediately available to Lender.

2.6    Prepayments. The Borrower shall have the right to prepay without penalty all or any portion of the Loan. Any notice of prepayment given by either of the Borrower shall specify the amount to be prepaid and prepayment date. The Borrower may not re-borrow any amount of principal paid on the Loan.

## ARTICLE 3

### CONDITIONS PRECEDENT TO LENDING

3.1    The Loan. In addition to any other conditions set forth in this Agreement, the obligation of the Lender to provide the Loan is subject to the condition that the Operating Agreement of Ginza 3 LLC is signed between the Lender and other Members of the Borrower. Parties acknowledge that this condition has been satisfied.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower hereby makes the following representations and warranties, which shall be deemed to be continuing representations and warranties until payment in full of the Loan:

4.1    Existence and Rights. The Borrower is duly organized and validly existing under the laws of the jurisdiction of its incorporation. The Borrower has full power and authority to own its respective property and to carry on its business as now conducted, and is duly qualified and

2

(b)    The Borrower shall be in material breach of (i) any representation, warranty or certification contained in this Agreement or (ii) any covenant contained in this Agreement, which covenant remains uncured by the Borrower for thirty (30) days following the date thereof; or

(c)    The Borrower (I) is adjudicated by a court of competent jurisdiction to be insolvent (ii) files a voluntary petition or commence a voluntary case seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, (iii) consents to the institution of, or fail to controvert in a timely and appropriate manner, any petition or case of the type described above, (iv) applies for or consent to the appointment of or taking possession by a custodian, trustee, receiver or similar official for or of itself or all or a substantial part of its properties or assets, (v) fails generally, or admit in writing its inability, to pay its debts generally as they become due, (vi) makes a general assignment for the benefit of creditors or (vii) takes any corporate action to authorize or approve any of the foregoing; or

(d)    Any involuntary petition or case shall be filed or commenced against the Borrower seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts, the appointment of a custodian, trustee, receiver or similar official for it or all or a substantial part of its properties or any other relief under the bankruptcy code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, and such petition or case shall continue undismissed and unstayed for a period of sixty (60) days; or an order, judgment or decree approving or ordering any of the foregoing shall be entered in any such proceeding; or

(e)    Any provision thereof is declared or held to be invalid or unenforceable by a court of competent jurisdiction or is repudiated by the Borrower or alleged by the Borrower to be invalid or unenforceable.

6.2    Remedies. Upon the occurrence and during the occurrence of an Event of Default, Lender, in addition to all rights and remedies provided by law at its option, and without notice to the Borrower, may declare the entire unpaid principal amount under the Loan, and all interest accrued and unpaid thereon, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower.

6.3    Waivers. The Borrower waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, notice of nonpayment at maturity, notice of intention to accelerate and notice of acceleration, so that the Lender may exercise any and all rights and remedies under the Loan Agreement, or as otherwise provided at law or in equity, immediately upon the occurrence of any Event of Default, without any further notice, grace or opportunity to cure whatsoever, Therefore, no further or delay of the Lender to exercise any right, power or privilege hereunder shall operate as a waiver

6.3    No Waiver of Remedies. No waiver of any breach of or default under any provision of the Loan Agreement shall constitute or be construed as a waiver by lender of any subsequent breach of or default under that or any other provision of the Agreement.

6.4    Remedies Not Exclusive. No remedy herein upon Lender is intended to be exclusive of any other remedy herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

ARTICLE 7.

4

## MISCELLANEOUS

7.1    Notices. Except as otherwise provided in this Agreement, all notices, demands, instructions and other communications required or permitted to be given to or made upon either party hereto or any other person shall be in writing and shall be personally delivered or sent by nationally recognized overnight courier service, or by fax, and shall be deemed to be delivered to the intended recipient for purposes of this Agreement on the date that such writing is received after having been sent in accordance with the provisions of this Section 7.1. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective fax numbers) indicated in the introduction of this Agreement.

7.2    Survival of Warranties. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement until the Loan is paid in full.

7.3    Severability. In case any provision herein shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of the provisions and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7.4    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that the Borrower may not assign this Agreement or any of its rights under this Agreement or any other Loan Document, without the prior written consent of the Lender.

7.5    Headings. Headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.

7.6    Modifications. This Agreement cannot be changed, modified or supplemented except in a writing signed by the party against whom enforcement of such change, modification or supplement is sought.

7.7    Payment on Non-Business Days. Whenever any payment to be made hereunder shall be due on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.

7.8    Applicable Law. This Agreement, its interpretation and enforceability and the rights and obligations of the Parties hereunder, as well as any non-contractual disputes in connection herewith, shall be governed by and construed in accordance with the laws of the State of New York, USA.

7.9    Arbitration clause. In respect of any dispute or difference, controversy or claim of whatever nature, howsoever arising under, out of or in connection with this Agreement, including regarding the breach, existence or validity of this Agreement or any non-contractual disputes in connection herewith (each a "Dispute"), the Parties shall endeavour in good faith to resolve such Dispute promptly and amicably through negotiations and:

(a)    if the matter is not resolved through such negotiations within thirty (30) days of any Party receiving written notification of the Dispute, then any Party may elect, by notice in writing to the other Parties, to settle and finally resolve such Dispute by arbitration in accordance with the International Chamber of Commerce ("ICC") in New York venue, Rules which Rules are deemed to be incorporated by reference into this clause;

(b)    the number of arbitrators should be 3 (three);

(c)    the seat or legal place of arbitration shall be deemed to be New York, and accordingly the substantive laws of New York shall be applicable for purposes of the arbitration. The venue for the arbitration hearing shall be London, at a location to be determined

5

by the tribunal. The procedural law for any reference to arbitration shall be English law. The language of the arbitration proceedings shall be English;

(d)    the arbitrators shall be appointed by the ICC Court;

(e)    any right of appeal or reference of points of law to the New York courts is hereby waived, to the extent that such waiver can be validly made.

7.10   Counterparts. This Agreement shall be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.11   Integration. This Agreement, including all Exhibits hereto, supersedes any and all other agreements, whether oral or written, which heretofore may have been made by and between Lender and Borrower relating to the subject matter hereof.

7.12   Expenses. The Borrower further agree to pay reasonable attorneys' fees, court costs and any other expenses, losses, charges, damages incurred or advances made by the Lender in the enforcement and protection of its rights or caused by any Borrower's default under the terms of this Agreement.

7.12   Taxes. The amount of the loan hereunder shall be free and clear of, and without deduction for, any and all present and future taxes, levies and imposts or other charges of any kind whatsoever, imposed, levied, collected or assessed with respect thereto by the Government of the United States of America and/or any State thereof, except for any withholding tax imposed upon Lender which Borrower is required to deduct under the applicable laws. Borrower shall furnish to Lender official tax receipts or other evidences issued by the tax authorities of the United States of America sufficient to enable Lender to establish payment of such withholding tax in support of a claim for an income tax credit.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

The Borrower:                     The Lender:

GINZA 8, LLC                 CONEWOOD LIMITED

By: _____       By: _____

Name: _Tatiana Brunetti_     Name: _Soteraxis Euripides_

Title: _managing member_     Title: _Director_

In the presence of:

Witness to the signature of the Borrower: _____

Name of the witness: _Julia Perelshae_

Address of the witness: _2444 Cings Hatnway #244_
_Brooklyn, NY 11223_
_USA_

Witness to the signature of the Lender: _____

Name of the witness: _Kyriacoula Nathanael_

Address of the witness: _Election Building, 2nd floor_
_5 Themistocles Dervi Street_
_CY-1066, Nicosia, Cyprus_

6.

# ADDITIONAL AGREEMENT

THIS ADDITIONAL AGREEMENT, dated 27.12.2012 is made by and among GINZA 3, a Limited Liability Company incorporated under the laws of the State of New York, USA whose registered address is 204 West 55th Street, New York, New York, USA (the "Borrower"), and CONEWOOD LIMITED, a company incorporated in the Republic of Cyprus under registered number HE 192397 whose registered office is at Julia House, 3 Themistocles Dervis Street, CY-1591 Nicosia, Cyprus (the "Lender").

## RECITALS:

WHEREAS, the Borrower and the Lender have entered into Loan Agreement (the "Main Agreement") dated 04.10.2011; and

WHEREAS, the Borrower desires to increase the principal amount of loan provided under the Main Agreement on the terms and conditions stipulated by the Main Agreement; and the Lender is willing to increase the loan amount under the request of the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the terms and conditions herein contained, the Borrower and the Lender hereby enter into this Additional Agreement and agree as follows:

## 1. INCREASE OF LOAN AMOUNT

1.1. The Lender agrees to make the loan of the additional amount (the "Additional Loan") not exceeding 500000 (Five hundred thousand) US dollars over the initial principal amount agreed in Article 2.1. of the Main Agreement.

1.2. The Lender and the Borrower do not limit the Additional Loan amount that should be provided to the Borrower by the Lender.

## 2. TERMS OF THE LOAN

2.1. The Additional Loan amount should be transferred by the Lender to the Borrower within 10 (ten) business days upon receipt of the Borrower's request specifying the amount of transfer. The Additional Loan could be provided in several tranches in such amounts as requested by the Borrower.

2.2. The Additional Loan should bear fixed annual interest rate of Three (3.0%) Percent over the one year LIBOR rate at the time of execution of this agreement for initial three (3) years and Three and a Half (3.5%) over one year Libor rate for the remaining term. Interest amount is calculated separately for each tranche of the Additional Loan from the date of receipt of such tranche till the date of repayment of such tranche or the Maturity Date of the Additional Loan agreed in Article 2.3. of this Additional Agreement.

2.3. The Maturity Date for the Additional Loan amount and interest on the Additional Loan should be 04.10.2021.

2.4. The Borrower shall have a right to repay the Additional Loan to the Lender before the Maturity Date without any penalty but in any event after repayment of the principal amount provided to the Borrower under the Main Agreement.

## 3. OTHER TERMS AND CONDITIONS

3.1. The terms of Main Agreement should be applied to this Additional Agreement if not in contradiction with the terms of the Additional Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Additional Agreement as of date first set forth above.

The Borrower:                               The Lender:

GINZA 3, LLC                                CONEWOOD LIMITED
By: _____                        By: _____

**EXHIBIT 2**

## THIRD AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## GINZA 3, LLC

THIS THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "**Agreement**") of GINZA 3 LLC D/B/A JELSOMINO NYC a New York limited liability company, is made and entered into as of November ____, 2011 (herein the "Effective Date") by and between:

**DMITRY SERGEEV f/n/a DZHEMALI KVARATSKHELIYA** ("Dmitry" or "Founding Member"), residing at 247 West 46th St., Apt. 4202, New York, NY 10036;

**TATIANA BRUNETTI** ("Tatiana", "Member"), residing at 247 West 46th Street, Apt. 3502, New York, NY 10036;

**PARMSTONE LTD.** ("Parmstone", "Investor" or "Member") located P.O. Box 3321, Drake Chambers Road Town, Tortola, British Virgin Islands:

**Whereas**, Dzhemali Kvaratskheliya, is a founding member of Company along with HARGITAY LTD. and is party to an Operating Agreement of the Company dated October 1, 2010 ("Operating Agreement");

**Whereas**, Hargitay has assigned all of interest in the Company to Parmstone, Ltd. and the parties desire to enter into the present Operating Agreement of the Company to reflect this assignment.

**Whereas**, DZHEMALI KVARATSKHELIYA has assigned 50.00 % (percent) of his interest in the Company to TATIANA BRUNETTI (henceforth known as "Member") pursuant to an Assignment and Assumption of Limited Liability Company Interest dated April 22, 2011 ("Assignment of Company Interest");

**Whereas**, Parmstone wishes to fund the new business operation by advancing the necessary loan proceeds in connection therewith;

**NOW, THEREFORE**, for good and valuable consideration, the undersigned agree as follows:

### ARTICLE 1

### COMPANY FORMATION

1.1   FORMATION. The Members hereby form a Limited Liability Company ("Company") subject to the provisions of the Limited Liability Company Act as currently in effect as of this date. A Certificate of Formation was filed with the Secretary of State.

1.2   NAME. The name of the Company shall be GINZA 3 LLC. The name of the restaurant shall be Jelsomino.

1



**1.3  REGISTERED OFFICE AND AGENT.** The location of the registered office of the Company shall be 204 West 55th Street, New York, New York.

**1.4  TERM.** The Company shall continue for a period of perpetuity unless terminated earlier pursuant to the terms hereunder.

**1.5  BUSINESS NAME-** The name of the business shall be operated as "JELSOMINO" to which name Dmitry represents that he has the full tradename rights and ownership and hereby grants license to the company for the use of said tradename.

**1.6  BUSINESS PURPOSE.** The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed under the Limited Liability statutes of the State of New York. The specific purpose of the Company is to operate and manage the restaurant/cabaret, lounge and bar to be established at 204 West 55th Street, New York, NY 10019.

**1.7  PRINCIPAL PLACE OF BUSINESS.** The location of the principal place of business of the Company shall be: 204 West 55th Street, New York, NY 10019 or at such other place as the Managers from time to time select.

**1.8  THE MEMBERS.** The members shall be: DMITRY SERGEEV, TATIANA BRUNETTI, and PARMSTONE LTD. The total number of units in the Company available for membership distribution is one hundred (100) units/shares.

**1.9  ADMISSION OF ADDITIONAL MEMBERS.** Except as otherwise expressly provided in the Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the written consent of all Members.

**1.10  BUSINESS PLAN.** The members agree to develop and operate the business as set forth in the attached business plan which is annexed hereto and made part hereof.

ARTICLE 2

MEMBERSHIP INTEREST

**2.1**  "Percentage Interest" means the relative ownership interest of each Member of the Company as set forth on Exhibit B hereto. Any reference to Percentage Interests shall mean the Percentage Interests as the same shall be amended or revised or recalculated from time to time based upon the admission of new Members, adjustments for defaults in required Capital Contributions or otherwise. "Members Interest" means all of the rights of a Member of the Company, including, without limitation, a Member's share of the capital, profits, losses and distributions of the Company, the right to inspect the Company's books and records and the right to participate in the management of and vote on matters of the Company's business.

2



## ARTICLE 3

## CAPITAL CONTRIBUTIONS

**3.1    CAPITAL ACCOUNT.** An individual capital account shall be established for each Member on the books and records of the Company (a "Capital Account"). The Capital Account shall be maintained in accordance with the principles of applicable Treasury regulations (the "Regulations") and the International Revenue Cone of 1986, as amended (the "Code"). The Capital Account of any Member as of any date shall be the amount of his Capital Contributions pursuant to this Article 3 (ether cash in its face amount or property or services in accordance with its fair market value as specified herein, provided property value shall be net of liabilities secured thereby that the Company assumes or is deemed to assume therewith under the Code and Regulations), increased by the amount of such Member's share of the Company's profit and gross income, and decreased by the amount of such Member's share of the Company's losses and gross deductions and by the amount of any distributions of property of the Company to such Member, in cash or property; and such Capital Account shall otherwise appropriately reflect transactions of the Company and Members.

**3.2.    QUALIFIED INCOME OFFSET.** Pursuant to Treasury Regulation 1.704-1(b)(2)(ii)9d), if after liquidation any Member's capital account has a deficit balance, Member shall not be obligated to restore the account of such deficit balance to the Company by the end of such taxable year or at any other time. Instead, the Member will be allocated items of gross income and gain in an amount sufficient to eliminate such deficit as quickly as possible.

**3.3    INITIAL CONTRIBUTIONS.**

The Members initially shall contribute to the Company capital as described in Exhibit C attached to this Agreement. The agreed value of such initial property and cash is $10,000 from each Member, which is hereby acknowledged.

**3.4    THE LOAN**

**a)    LOAN AMOUNT.    ($3,335,917.00)** Parmstone agrees to provide a Loan to the Company in an amount of Three Million Three Hundred Thirty Five Thousand Nine Hundred Seventeen Dollars ($3,335,917.00) to finance the project. The parties acknowledge that Parmstone has made certain advances to date as loans to the company totaling NINE HUNDRED AND FIFTEEN THOUSAND FIVE HUNDRED AND TWENTY SIX ($915,526.96) DOLLARS and agrees upon the other member's compliance with the terms hereunder to advance an additional TWO MILLION AND FOUR HUNDRED ELEVEN THOUSAND SEVEN HUNDRED SIXTY TWO ($2,411,762.00) DOLLARS as loan to the company. Upon the following schedule:

1) Upon execution of this agreement the sum of $500,000.00.
2) Within 30 days of execution of this agreement- $500,000.00.
3) Upon commencement of construction to the interior of the premises-$1,000.000.00.

3



4) Upon the actual opening of the restaurant- $420,390.00.

**b)**     **INTEREST RATE.** For the first three (3) years commencing on the date of this Agreement, the Loan shall bear an interest of three (3.0%) percent per annum over LIBOR rate then prevailing, adjusted annually at the beginning of each calendar year. Thereafter, after the expiration of the three year term, the interest rate shall be three point five (3.5%) percent per annum adjusted yearly at the beginning of each calendar year. The term of the loan shall be ten (10) years.

## 3.5     ROYALTY FEE.

Parmstone shall pay Dmitry a one time royalty fee ("Royalty") in an amount of One Hundred and Twenty Thousand ($120,000.00) Dollars for using the trade name "JELSOMINO" for this first JELSOMINO restaurant in the United States. The Royalty fee shall be payable within 30 days from the opening of the restaurant. Payment of Realty fee shall give Parmstone or its designee rights of first refusal to invest and participate in any additional JELSOMINO restaurants to be opened in the U.S.

## 3.6     COLLATERAL.

a)     As collateral for the loan advances by Parmstone, twenty (20) of the fifty (50) membership certificates held by Dmitry and Tatiana shall be held by Parmstone ("in escrow") until full repayment of the Parmstone loan advances. Said membership certificates shall be duly endorsed on the back in favor of Dmitry and Tatiana and shall not be transferred without written consent of Dmitry and Tatiana, absent a material breach of fiduciary duty, bad-faith, or reckless conduct.

b)     Within fifteen (15) days of full repayment of the Loan with interest to Parmstone, the Parmstone and/or its agents or assigns shall transfer and/or sell twenty (20) membership certificates to Dmitry and Tatiana for a nominal amount of Ten ($10) Dollar.

## 3.7 ADDITIONAL CONTRIBUTIONS AND CAPITAL NEEDED TO FUND BUSINESS OPERATIONS.

(a)     The members represent that that loan herein shall be sufficient to fund and operate the business as set forth in the accompanying business plan. Subject to the provisions of Section 3.7(b) hereof no Member shall be required to make any additional Capital Contributions in excess of such Member's commitment set forth in Sections 3.3 and 3.4 above.

(b)     In an event the Loan advances are depleted, the Board of Directors may reasonably determine that additional Capital Contributions are required for the operation of the Business. If, for any reason, a Member fails to make timely payments of his prorata share of any such additional Capital Contribution (a "Non-Contributing Member") then, and in such event, the remaining Members shall have the right, but not the obligation, to advance directly to the Company an amount equal to the additional Capital Contribution required of the Non-Contributing Member (a "Contribution Loan"). The Contribution Loan shall be made by the

4

*T.B*

remaining members who are willing to do so (the "Contributing Members") in such amounts as they may agree or, in the absence of the agreement, in proportion to their Percentage Interest (computed exclusive of the Percentage Interest of the Non-Contributing Member). The amount of the Contribution Loan shall be treated as a Capital Contribution of the Non-Contributing Member.

(c)     Any Contribution Loan shall be on the same terms as original term (bear an interest at a rate of Three (3.0%) percent per annum over LIBOR rate for the initial three (3) years and Three and a Half (3.5%) over LIBOR for the remaining term), and shall be repaid out of the subsequent distributions of cash received by the Company as set forth in Section 4.1 of the Agreement or distributions in dissolution of the Company as set forth in 4.2(c) of the Agreement ("Distributions in Liquidation"), to which the Non-Contributing Member is entitled, such amounts to be applied first to accrued interest and then to principal. No Distributions in Liquidation shall be paid to Non-Contributing Member until all Contribution Loans, inclusive of accrued interest thereon, attributable to each Member, have been paid in full to the applicable Contributing Members.

# ARTICLE 4

## DISTRIBUTIONS, PROFITS AND LOSSES

**4.1     DISTRIBUTIONS.** Any cash received by the Company, net of the Company's expenses and entire overhead and any reserve deemed necessary or required by the Chief Financial Officer, but excluding distributions in connection with the liquidation of the Company, shall be distributed to the Members as follows:

(a)     70% to Parmstone and 15% to Dmitry and 15% to Tatiana, until the Loan to Parmstone is repaid in full with interest;

(b)     Thereafter, to the Members pro rata according to their relative percentage interest: 50% to Parmstone and 25% to Dmitry and 25% to Tatiana.

(c)     Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

**4.2     PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined by the Company Accountants after taking into consideration the repayment of the loan advances made hereunder by Parmstone on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit B as amended from time to time in accordance with Treasury Regulation 1.704-1. The accountants for the Company shall be selected by Parmstone.

5

**4.3    PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined by the Company Accountants after taking into consideration the repayment of the loan advances made hereunder by Parmstone on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit B as amended from time to time in accordance with Treasury Regulation 1.704-1. The accountants for the Company shall be selected by Ginza 3, LLC. Parmstone shall have the right to request an audit of the Company's financial records at Company's expense. Parmstone shall have the right to examine the Company's financial records at any time, upon reasonable notice.

## ARTICLE 5

## MANAGEMENT

**5.1    MANAGEMENT    OF    THE    BUSINESS    AND    DUTIES    OF MANAGING/NONMEMBER MANAGERS.** The name and place of residence of each Manager is set forth herein below and shall consist of four (4) members and/or non-member managers (the "Board of Directors"). The initial managers appointed by Dmitry Sergeev are: Dmitry Sergeev and Tatiana Brunetti. The initial managers appointed by Parmstone are: Alexey Starozhilov and Olga Serdyuk. By a vote of the Members holding a majority of the capital interests in the Company, as set forth in Exhibit B and as may be amended from time to time, shall elect so many Managers as the Members determine, but no fewer than three, with one Manager elected by the Members as Executive Manager i.e. who shall be in charge of the executive management of the business. Upon execution of this agreement, Dmitry Sergeev ("Dmitry") is hereby appointed as the initial Executive Manager, as defined hereunder, until he next annual meeting of the Board of Managers. A Managing Member of the Company may only be removed for cause from the position of Manager upon an affirmative vote of Members holding two-thirds of the Members' Percentage Interests. Under the supervision of the Chief Financial Officer and in accordance with the attached Business Plan, an Executive Manager or its designated agent shall be responsible for the day to day management of all aspects of operating the restaurant business at 204 West 55th Street, New York, New York, third party vendors, disbursements hiring and firing of employees, and preparation and submission of monthly management logs and monitoring P/L statement, to Parmstone and/or the Chief Financial Officer. The aforesaid Executive Manager shall not compete, as a direct or indirect equity partner, independent contractor or employee with any third party, with the business of the company for a period of five (5) years in a ten (10) block radius of the business premises. Notwithstanding the foregoing the Board of Managers shall have to approve any Company contract over $100,000.00.

**5.2    MEMBERS.** The liability of the Members shall be limited as provided under the laws of the New York Limited Liability statutes. Members that are not Managers shall take no part whatever in the control, management, direction, or operation of the Company's affairs and shall have no power to bind the Company, unless a material default by Manager warranting removal for cause. The Managers may from time to time seek advice from the Members, but they need not accept such advice, and at all times the Managers shall have the exclusive right to control and manage the Company, except for the operational matters under the control of the CFO pursuant

6



to this agreement. No Member shall be an agent of any other Member of the Company solely by reason of being a Member.

**5.3     REMOVAL FOR CAUSE.**

a.     Subject to the provisions of Section b. below, an Executive Member may only be removed for Cause by a vote of the Members. Cause shall be defined as: willful misconduct involving breach of fiduciary duties or extremely reckless conduct. A manager may resign upon giving two weeks' notice to the Board of the Directors.

**5.4     VALUATION OF SHARES; DETERMINATION OF BOOK VALUE**
The purchase price of each share of the Company's stock to be determined pursuant to any provision of this Agreement where it is essential to determine the value of each individual share shall be as follows:
The price to be paid for each share/unit of the Company to be purchased and sold under this Agreement shall be the "Book Value" that shall be determined by the regularly-employed Certified Public Accountants for the Company, using generally accepted accounting principles, subject to the further provisions of this Paragraph. In computing the book value, the following adjustments shall be made:

(a)     The Company's machinery and equipment shall be valued at the lower of replacement cost or fair market value;

(b)     Value shall be ascribed for the good will, if any, of the Company;

(c)     The face amount of the Company's accounts receivable as of the valuation date shall be determined by the Company's regular accountant and adjusted for uncollectible accounts by an amount representing the average collection percentage as experienced in the year preceding the valuation date;

(d)     The amount of the Company's liabilities as of the valuation date shall be determined by the Company's accountant;

(e)     The amounts determined under paragraphs (a) through (c) above shall be added together and, from the sum so determined, the Company's liabilities as determined under paragraph (d) above shall be subtracted;

(f)     Book value of any particular block of shares/units to be sold hereunder shall be determined by multiplying the total book value of the Company by a fraction, the numerator of which shall be the number of shares/units to be sold, and the denominator of which shall be the number of all the issued and outstanding shares/units of stock of the Company (100) (including the number of shares to be sold). It is further agreed that in connection with any determination of book value hereunder, there shall be no deduction from the book value for any extraordinary (i.e., not within the regular course of business) corporate expense, losses or liability incurred within thirty (30) days of the date book value is computed, nor shall there be any increase to book value for any extraordinary profit, gain or surplus, received within thirty (30) days of the date book value is computed.

7



**5.5**     **PURCHASE OF SHARES UPON DEATH**

Upon the death of a Member, all of the shares/units of the Corporation owned by the deceased Member and to which he or his personal representatives shall be entitled, shall be sold and purchased as hereinafter provided:

(a)     The remaining Members may elect to purchase from the deceased Member's personal representatives, and the deceased Member's personal representatives shall then sell to the surviving Members, all shares of stock/ and or units of the Company owned by the deceased Member and to which his personal representatives may be entitled;

(b)     The purchase price shall be determined in accordance with the valuation provisions of paragraph 5.4 above;

(c)     The Closing of such purchase and sale shall take place at the principal office of the Company at a date designated by the Company, which date shall not be earlier than 30 days following the date of the qualification of the deceased Member's personal representatives nor later than the last day of the period for distribution set forth in the United States Internal Revenue Code Section 303(b)(I) as that provision now exists or as it may hereafter be amended;

(d)   If the surviving Members elect not to purchase the deceased Member's shares/units (and notification of such must be submitted in writing to the personal representatives of the deceased Member within sixty (60) days of death) the shares/units shall pass to the estate of the deceased Members in accordance with the laws of the State of New York. In this instance, the Company shall continue to make Company Distributions to the personal representatives of the deceased Member, or lawful distributee, in accordance with Distribution schedule contained in Paragraph 4.1 of Article 4 herein.

**5.6     POWERS OF MANAGEMENT**

**The Managers shall have the following powers:**

a)  to protect the Company's assets;

(b) the purchase or other acquisition of other assets of all kinds;

(c) the management of all or any part of the Company's assets;

(d) the borrowing of money and the granting of security interests in the Company's assets;

(e) the pre-payment, refinancing or extension of any loan affecting the Company's assets;

(f ) the compromise or release of any of the Company's claims or debts; and,

(g) the employment of persons, firms or corporations for the operation and management of the company's business.

8



In the exercise of their management powers, the Managers are authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets;

(b) all checks, drafts and other orders for the payment of the Company's funds;

(c) all promissory notes, loans, security agreements and other similar documents; and,

(d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.

**5.7   EXECUTIVE MANAGER.** The Executive Manager or its designated agent shall have primary responsibility for managing the operations of the Company and for effectuating the decisions of the Managers in accordance with the attached business plan.   None of the managers shall receive a salary for his or her services hereunder.

**5.8   NOMINEE.** Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the Members may designate.  The Managers shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his willful misconduct or gross negligence.

**5.9   COMPANY INFORMATION.** Upon reasonable notice, and upon request of any Member, the Managers shall supply to the requesting member information regarding the Company or its activities.   Upon reasonable notice, each Member or his authorized representative shall have access to and may inspect and copy all books, records and materials in the Manager's possession regarding the Company or its activities. The exercise of the rights contained in this Section 5.6 shall be at the requesting Member's expense.

**5.10  EXCULPATION.** Any act or omission of the Managers, the effect of which may cause or result in loss or damage to the Company or the Members if done in good faith to promote the best interests of the Company, shall not subject the Managers to any liability to the Members.

**5.11  INDEMNIFICATION.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of

9



the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

**5.12  RECORDS.**  The Managers shall cause the Company to keep at its principal place of business, or at the offices of its accountants, the following:

(a)  a current list in alphabetical order of the full name and the last known street address of each Member;

(b)  a copy of the Certificate of Formation and the Company Operating Agreement and all amendments;

(c)  copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

(d)  copies of any financial statements of the limited liability company for the three most recent years.

**5.13 ACCOUNTANTS.**  The parties agree that Ginza 3, LLC shall select the accountant for the company. Parmstone shall have the right to request an audit of the Company's financial records at Company's expense.  Parmstone shall have the right to examine the Company's financial records at any time, upon reasonable notice.

**5.14 BUSINESS PLAN.** Parmstone acknowledges that it received the business plan annexed hereto which contains the projected figures for the project and the proposed budget for the Company.

**5.15 LIQUOR LICENSE AND COUNSEL.**  The parties agree that Michael Szegda, Esq. will obtain or effectuate a transfer of the liquor license.

**5.16 BANK ACCOUNTS.**  All restaurant proceeds shall be deposited in a Master Bank Account at the New York City -- Manhattan branch with dual signatures required for any check, including Dmitry Sergeev and the Chief Financial Officer selected by Parmstone. In order to facilitate working capital requirements on a monthly basis, a separate working capital checking account will be funded each month so that the Executive Manager may issue checks with one signature -- that of the Executive Manager or its designee. The working capital needs of the company shall be reviewed each month by the Members.

**5.17 ARBITRATION.**  In the event of deadlock, the matter shall be referred to the American Arbitration Association-Commercial Division in New York City before a single arbitrator whose decision shall be binding on all parties.  Each party shall be responsible for their own legal fees.

**ARTICLE 6**

**COMPENSATION**

10

**6.1    MANAGEMENT FEE.** Unless the Board decides otherwise, the Executive Manager who will be in charge of the operation of the Company's business and shall be rendering daily services to the Company shall not be entitled to additional compensation other than the right to contribution as set forth in Paragraph 4.1 and 4.2 above.

**6.2    REIMBURSEMENT.** The Company shall reimburse the Managers or Members for all direct out-of-pocket expenses incurred by them in managing the Company upon prior written approval of the Chief Financial Officer, which shall not be unreasonably withheld. Reimbursement of travel expenses less than $2,500.00 per month per member shall not require prior approval from Parmstone. Reimbursement of travel expenses of more than $2,500.00 per month per member shall require written approval from Parmstone, which shall not be unreasonably withheld.

**6.3    TRAVEL AND OTHER EXPENSES.** The Company shall reimburse the Members and the Manager Members for all reasonable out-of-pocket expenses incurred by them in furtherance of the objectives of the Company, including travel. The Company shall pay all reasonable travelling expense incurred by Principal Partners/ Members: Tatiana Brunetti and Dmitry Sergeev, including: airfare economy class, hotel stay, rental car or any cab/car service transportation during business trips, meal expenses (reasonable only) during scouting locations, construction/build out period and soft opening. Travel expenses will be accounted in total budget of the project. After a restaurant is opened for business, all travel expenses of the Managing Members will be absorbed by the restaurant in the form of an operating expense (travel category for managing partners). The Company shall also reimburse Managers appointed by Parmstone for all the reasonable out-of-pocket expenses incurred by them in respect of inspections which could be organized once in every 6 months including: airfare economy class, hotel stay, rental car or any cab/car service transportation during business trips, meal expenses (reasonable only) during scouting locations, construction/build out period and soft opening.

## ARTICLE 7

## BOOKKEEPING

**7.1  BOOKS.** The Managers shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business or at the offices of Company's accountants. Such books shall be kept on such method of accounting as the Managers shall select. The company's accounting period shall be the calendar year. Subject to 5.5 above, all members shall have open access to the books and records of the company on a daily basis whether by written report or access to the registers of the restaurant. All sales proceeds information shall be accessible electronically via the internet to the members on a weekly or daily basis. To effectuate same, parties agree to install a point-of-sales and camera system to track receipts and expenses on a current basis.

**7.2  MEMBER'S ACCOUNTS.** The Managers shall maintain separate capital and distribution accounts for each member. Each member's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of his initial capital contribution increased by:

11



(a) any additional capital contribution made by him/her;

(b) credit balances transferred from his distribution account to his capital account; and decreased by:

(a) distributions to him/her in reduction of Company capital;

(b) the Member's share of Company losses if charged to his/her capital account.

**7.3 REPORTS**. The Managers shall close the books of account after the close of each calendar year, and shall prepare and send to each member a statement of such Member's distributive share of income and expense for income tax reporting purposes.

## ARTICLE 8

## TRANSFERS

**8.1 ASSIGNMENT**. Subject to Section 8.3 below, Parmstone shall have the right to sell its Fifty (50) units/shares at any time to a third party during the term of this Agreement. In an event of a material breach constituting a breach of fiduciary duties and prior to the repayment of the Loan with interest, Parmstone retains the right to sell or retain as sole owner an additional Twenty (20) shares owned collectively by Dmitry and Tatiana and held by Parmstone as collateral for the loan. Prior to exercising its right to sell the additional 20 shares of Dmitry and Tatiana, Parmstone shall provide 30 days' written notice ("Notice to Cure Breach") of its intention to hold Dmitry and Tatiana in breach herein containing a 30 day right to cure to cure breach. Such written notice shall be provided to Dmitry and Tatiana and their attorney at address below or other designated address.

**8.2**      Upon repayment of the Loan with interest to Parmstone or its designee/assignee, each party shall have the right to sell its fifty percent interest (50) shares at any time to a third party during the term of this Agreement.

**8.3**      If at any time Member proposes to sell, assign or otherwise dispose of all or any part of his interest in the Company, such Member shall first make a written offer to sell such interest to the other Members at the same price agreed to be purchased by the third party, or at a price determined by mutual agreement. If such other Members decline or fail to elect such interest within sixty (60) days, and if the sale or assignment is made and the Members fail to approve this sale or assignment unanimously then, pursuant to the New York Limited Liability statutes, the purchaser or assignee shall have no right to participate in the management of the business and affairs of the Company. The purchaser or assignee shall only be entitled to receive the share of the profits or other compensation by way of income distribution set forth herein to which that Member would otherwise be entitled.

**8.4 INDEPENDENT COUNSEL**. The parties hereto acknowledge that Alexander Karasik, Esq. of 65 Broadway, Seventh Floor, New York, NY represents Dmitry Sergeev and Tatiana Brunetti in this transaction and that each party hereto has been advised to seek independent counsel to

12

_T.B_

review the terms of this agreement before execution thereof and acknowledges that they have had an opportunity to do so.

**8.5. RIGHT OF FIRST REFUSAL.** Parmstone shall have the right of first refusal to open additional restaurants in collaboration with Dmitry and Tatiana in the name of Jelsomino anywhere in the State of New York.

Dated: New York, New York

November _____, 2011

PARMSTONE LTD.

_____
Member


DMITRY SERGEEV

_____
Member


TATIANA BRUNETTI

_____
Member


13

T.B

EXHIBIT A

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

GINZA 3 LLC

LISTING OF MANAGING MEMBERS

By a majority vote of the Members the following Managers were elected to operate the Company pursuant to ARTICLE 4 of the Agreement:

DIMITRY SERGEEV, Executive Manager-Member

TATIANA BRUNETTI, Manager_____

_____

_____

The above listed Manager(s) will serve in their capacities until they are removed for cause by a majority vote of the Members as defined by ARTICLE 4 or upon their voluntary resignation.

Signed and Agreed this _____ day of _____, 2011.

_____          _____
Member                                          Member

_____
Member

14

T. B

EXHIBIT B

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

FOR GINZA 3 LLC

LISTING OF MEMBERS and UNIT OWNERSHIP PRIOR TO REPAYMENT OF LOAN

As of the _____ day of November, 2011 the following is a list of Members of the Company:

1.  PARSTONE LTD.                                             70 units

2.  DIMITRY SERGEEV                                          15 units

3.  TATIANA BRUNETTI                                         15 units

* Upon repayment of the Loan and Interest set forth in Paragraph 3.4 herein, the Membership Interest in the Company shall be:

1.      PARMSTONE LTD.                                       50 units

2.      DIMITRY SERGEEV                                      25 units

3.      TATIANA BRUNETTI                                     25 units

_____
Member

_____
Member

_____
Member

15

𝒯ℬ

**EXHIBIT C**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**GINZA 3, LLC**

**CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be Thirty Thousand ($30,000.00) dollars. The description and each individual portion of this initial contribution is as follows:

| | |
|---|---|
| Parstone Ltd. | $10,000.00 |
| Dimitry Sergeev | $10,000.00 |
| Tatiana Brunetti | $10,000.00 |

16

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

---

Parmwood Assignment LLC,

                    Plaintiff,

v.                                               Civil No.:

Ginza 3, LLC, Ginza Holding LLC,
Dzenali Kvaratskheliya a/k/a Dmitry Sergeev,
Tatiana B. Brunetti, and Ginza 2, LLC
d/b/a Mari Vanna Restaurant,

                    Defendants.

---

## SUMMONS AND COMPLAINT

---

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
*Attorneys for Plaintiff*
**10 Bank Street, Suite 700**
**White Plains, NY 10606**
**(914) 949-2909**